## Longenberger et al., Admrs., *v.* Prudential Insurance Company of America, Appellant.

Argued October 28, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*A. A. Vosburg,* with him *A. Floyd Vosburg,* for appellant.

Daniel W. Kearney, with him Wm. C. Johnston and Geo. J. Vanderslice, for appellee.

OPINION BY KELLER, P. J., February 28, 1936:

This is an appeal by a life insurance company from a judgment entered against it for want of a sufficient affidavit of defense, in an action by the administrators of the insured's estate.

The policy was issued on March 5, 1923, in the amount of $1,000, payable to the insured's wife, Marie O. Longenberger, as beneficiary, if living; otherwise to the executors, administrators or assigns of the insured. The right to change the beneficiary was expressly reserved to the insured.

The policy provided that it was incontestable after one year, except for non-payment of premiums, and also contained the following material provision: "Suicide.—If within one year from the date hereof the Insured shall die by suicide—whether sane or insane—the liability of the Company shall not exceed the amount of the premiums paid on this Policy".

The material facts as averred or admitted in the affidavit of defense are as follows:

On December 26, 1933, while the policy was in full force and effect the insured's wife, the beneficiary named in the policy, died, intestate, as the result of a gunshot wound inflicted by the insured.

On December 27, 1933, while the policy was in full force and effect, the insured died, intestate, as the result of a self-inflicted gunshot wound.

The insurance company contended that the legal effect of these averments and admissions was wholly to invalidate the policy. The court below ruled otherwise, and entered judgment for the face of the policy.

Appellant's first contention, that the killing of the beneficiary by the insured invalidated the policy, is definitely ruled against it by our decision in Allegheny

Trust Co. v. State Life Ins. Co., 110 Pa. Superior Ct. 37, 167 A. 251, where a similar claim was made on facts practically the same as here. We there pointed out that the appellant insurance company had confused the case with our ruling in Collins v. Metropolitan Life Ins. Co., 27 Pa. Superior Ct. 353, which held that where the *insured* has been executed for murder his executor could not recover on the policy, although payable to his legal representatives, on the ground of public policy, because "an ordinary life policy, *containing no applicable special provisions,* will not be held to be a contract insuring against a legal execution for crime;" and with the cases holding that the *beneficiary* of a life insurance policy, who murders the *insured,* may not recover in an action on the policy (See Robinson v. Metropolitan Life Ins. Co., 69 Pa. Superior Ct. 274). We said: "To conclude that the insured killed his wife in order to do what he could have accomplished by notifying the company of his desire to change the beneficiary is too absurd to require any discussion. And a denial of liability on the ground of public policy, based on such a premise, as respects a contract of insurance on his own life, is carrying the doctrine far beyond its limits as recognized in this State. The killing of the wife initiated no claim whatever upon the policy on the husband's life; it was his suicide which made the policy payable".

Appellant's other contention was that the suicide of the insured—there being no averment in the plaintiffs' statement of claim that he was insane at the time—invalidated the policy of insurance because a recovery under such circumstances (1) would be a fraud on the insurance company, and (2) would be against public policy.

The following legal principles are well established in this State:

1. An insurer may insert in the contract of insur-

ance a valid stipulation that the policy shall be void if the insured shall die by his own hand. But such a stipulation will not be enforced if the insured is insane at the time he kills himself: American Life Ins. Co. v. Isett's Admrs., 74 Pa. 176; Connecticut Mutual Life Ins. Co. v. Groom, Admr., 86 Pa. 92; Manhattan Life Ins. Co. v. Broughton, 109 U. S. 121.

2. In the absence of such a stipulation or provision, a policy in favor of the insured's wife as beneficiary will not be avoided by the suicide of the insured: Morris v. State Mutual Life Ins. Co., 183 Pa. 563, 39 A. 52; Marcus v. Heralds of Liberty, 241 Pa. 429, 436, 88 A. 678. In the former case, the court, by Mr. Justice DEAN, said: "We are not called upon to decide what would have been the effect on the contract if the policy itself had been payable to the insured or his personal representatives". The decision was based on cases[1] involving policies payable to the wife, without any change of beneficiary reserved to the insured.

3. The insurer may, however, insert in the policy a stipulation that it shall not cover death of the insured by suicide, whether he is sane or insane. In such event there can be no recovery on the policy whether it is payable to the insured's estate or a named beneficiary, and whether the insured was sane or insane at the time he killed himself: Starck v. Union Central Life Ins. Co., 134 Pa. 45, 19 A. 703; Tritschler v. Keystone Mut. Ben. Assn., 180 Pa. 205, 36 A. 734; Sargeant v. National Life Ins. Co., 189 Pa. 341, 41 A. 351; Hall v. Mutual Reserve Fund Life Assn., 19 Pa. Superior Ct. 31.

4. The insurer, on the other hand, may insert in the policy a stipulation that it shall not cover death of the insured by suicide within a limited period—say, one year or two years—whether he is sane or insane.

---

[1] Gibbons v. Gibbons, 175 Pa. 475, 34 A. 846; Matlack v. Mutual Life Ins. Co., 180 Pa. 360, 36 A. 1082.

In such event, a beneficiary may recover on the policy if the insured commits suicide after the expiration of the period fixed in the policy, whether the insured was sane or insane when he killed himself: Krebs v. Phila. Life Ins. Co., 249 Pa. 330, 332, 95 A. 91; but may not recover if the suicide occurs before the expiration of the period fixed in the policy, whether the insured was sane or insane at the time.

The questions to be decided here are, (1) What is the legal meaning and effect of such a stipulation in a policy of insurance? and (2) Is there any policy of the law in Pennsylvania which forbids the enforcement of such a contract by the insurer where the policy is payable to the estate of the insured and his suicide occurs after the expiration of the period fixed in the policy, and no evidence of his insanity at the time is produced?

We will discuss them in their order.

(1) The legal meaning and effect of a provision that the policy shall be void, if, within a certain time, the insured, while sane or insane, shall die by his own hand, taken in conjunction with a provision that the policy shall be incontestable after a certain time, cannot be better expressed than in the language of the late Mr. Justice HOLMES in Northwestern Mutual Life Ins. Co. v. Johnson, and National Life Ins. Co. v. Miller, Admr. of Johnson, 254 U. S. 96, 102, where he said: "We are of opinion that the provision in the first mentioned document avoiding the policy if the insured should die by his own hand within two years from the date is an inverted expression of the same general intent as that of the clause in the second making the policy incontestable after one year, and that both equally mean *that suicide of the insured, insane or sane, after the specified time shall not be a defense.* It seems to us that that would be the natural interpretation of the words by the people to whom they are addressed, and that the language of each policy makes

the company issuing it liable in the event that happened" (italics supplied).

(2) There are some dicta, or obiter expressions, in this State which lend support to the contention that a stipulation, having that legal effect, would be against public policy as respects a contract of insurance payable to the estate of the insured. They all refer back to the case of Hartman v. Keystone Insurance Co., 21 Pa. 466. The real point involved in that case was whether a clause in the policy providing that it should be null and void "if the assured shall die by his own hand, in, or in consequence of a duel, or by the hands of justice" etc., embraced a suicide by swallowing arsenic, and it was very sensibly held that it did; that the clause meant, "die by his own hand—that is, any sort of suicide,—or die in or in consequence of a duel, or die by the hands of justice". The opinion writer then added: "Besides this, the court was very plainly right in charging that if no such condition had been inserted in the policy, a man who commits suicide is guilty of such a fraud upon the insurers of his life that his representatives cannot recover for that reason alone".

The court, in that case, said nothing about *public policy;* the last paragraph of the opinion, which was inserted after the decision on the main point, referred to *fraud on the insurers,* and cannot be applied to a clearly expressed provision inserted in the policy by the insurer itself. The case was commented on in American Life Ins. Co. v. Isett's Admrs., supra, as follows: "The case of Hartman v. Keystone Ins. Co., 9 Harris 466, is not in conflict with the charge of the court. It merely holds that if the insured committed suicide by swallowing poison, he died by his own hand. It does not profess to hold that self-destruction by the insured, in all cases, avoids the policy."

The purpose of the provision in the policy fixing a period of one or two years within which suicide by the

insured, whether sane or insane, will avoid the policy, was to prevent an attempted fraud on the company. Mr. Justice HOLMES in Northwestern Mutual Life Ins. Co. v. Johnson, supra, said, in discussing Ritter v. Mutual Life Ins. Co., 169 U. S. 139, and distinguishing it from the case under consideration: "The point decided was only that *when the contract was silent* there was an implied exception of such a death.  There was evidence that the insurance was taken out with intent to commit suicide, and it plainly appeared that the act was done by the insured for the purpose of enabling his estate to pay his debts.  The application, although excluded below, warranted against suicide within two years, within which time the death took place.[2]  So that all the circumstances gave moral support to the construction of the policy adopted by the court in accordance with the view that has prevailed in some jurisdictions as to the general rule" (italics supplied).

In fixing one year (or two years, as the case may be) as the period within which the insured's suicide, whether sane or insane, should not create a cause of action on the policy, the insurers adopted the year or two thus chosen as the extreme limit of time that a person would probably take out life insurance with the intent of killing himself in order to benefit his family or his creditors at the expense of the insurance company; and by necessary implication they agreed thereby that suicide of the insured, sane or insane, after the expiration of this period of time was not contemplated by him at the time the insurance was taken out and would not be a fraud on the company; and that they would regard suicide after that length of time as one of the hazards covered by the policy.  This was in accord with the law in some jurisdictions that suicide, unless

---

[2] The insurance policy was issued November 10, 1891.  The insured killed himself October 5, 1892.  He took out $200,000 additional insurance in 1892.

contemplated when the policy was applied for, should not be a defense to an action on the policy. See Whitfield v. Aetna Life Ins. Co., 205 U. S. 489. It is a matter of interest to note that Mr. Justice HARLAN who wrote the opinion in the Whitfield case, was also the opinion writer in the earlier case of Ritter v. Mutual Life Ins. Co., supra, which it qualified. The defense of 'fraud' cannot be successfully invoked where the company has, with clear purpose in mind, expressly agreed to do the very thing which the other party to the action is seeking to compel it to do.

Judges who have ruled that it is against public policy to permit an insurance company to contract to pay the insured's estate the face of the policy if he commits suicide while sane more than one or two years after the issuance of the policy generally have so ruled by analogy to the well established law relative to fire insurance policies. But it is respectfully submitted that there is no real analogy between them. When one insured under a fire insurance policy wilfully burns the insured property to collect the insurance he personally profits by the crime, if it is successful, either by receiving the proceeds of insurance himself or by relieving himself of a debt or obligation to which he or his property was subject. The same thing may be said where one who is insured against personal disability, wilfully brings about a disability, which if accidental would be covered by the policy; he attempts to reap for himself a personal profit from his own wrongful act. See Elwood v. New England Mut. Life Ins. Co., 305 Pa. 505, 158 A. 257, where it was said (p. 513) that cases of life insurance in which self-destruction was *accomplished,* were not applicable in such a situation. But a dead man reaps no personal profit by his own death. He and his estate are not one and the same. "Death acquits us of all obligations."[8] Leaving out of the case

---

[8] Montaigne, Bk. 1, 7.

the fraudulent securing of insurance for the express purpose of making provision for his family or paying his creditors, which is provided against by the clause in the policy above referred to, and which we have just discussed at length—in this case, certainly, there was no such fraudulent intent, for the policy was in force over ten years—an insured does not *personally* profit by taking his own life. The policy is not payable until after his death. His insurance goes to his wife, family, creditor or other *beneficiary* named; or if it is payable to his estate, it goes to his wife and legatees, if he dies testate and solvent; or to his creditors, and, perhaps, his wife, family and next of kin, or legatees, if his estate is otherwise insolvent. There is no essential difference as to the persons who get the insurance money —by this, we mean, that any person who received it, or part of it, on distribution of his estate could have been named as a beneficiary and receive it as such; and it is recognized, even by those who suggest that it is against public policy to permit a recovery on such a policy by an insured's legal representatives, in case of his suicide after the period limited in the policy, that the rule would not be applied against a surviving beneficiary who is guiltless of any act contrary to public morals, even though he or she might be the same person as would receive it if distributed as part of his estate. And this is especially so now when nearly all policies reserve to the insured the right to change the beneficiary.

The most that can be said is that it is the policy of this State to deny recovery on a policy of insurance payable to the insured's estate, *where the policy contains no provision respecting suicide* and the insured kills himself while sane. But there is no good reason for extending this policy so as to invalidate a provision which allows a recovery in such circumstances provided the suicide takes place long enough after the issuance

of the policy to sustain the conclusion that the insurance was not taken out fraudulently and with the intent of committing suicide. With the element of fraud eliminated, there are reasons which might fairly lead an insurance company to assume such a hazard, and having been compensated for the risk, to be required to carry out its contract. There are many people who believe that no one in the full possession of all his faculties ever commits suicide; and, in any event, it is a matter difficult to prove or establish. We can see no compelling reason why an insurance company, which has been compensated for the risk, may not agree that it will not raise that question, provided the suicide occurs sufficiently long after the taking out of the policy to satisfy the company that it was not contemplated when the insurance was applied for.

On full consideration, we are of opinion that the 'suicide clause' in the policy in suit is too clear for misunderstanding; that as expressed in the language of Mr. Justice HOLMES in Northwestern Life Ins. Co. v. Johnson, supra, it means, that suicide of the insured, sane or insane, after the time specified in the policy shall not be a defense. And we are further of opinion that such a clause is not contrary to public policy in this State whether the policy is payable to a named beneficiary or to the insured's estate. This is the view in a majority of jurisdictions.[4] We call attention, also, to the fact that the General Assembly has committed to the Secretary of Insurance the authority to pass on the form of life insurance policies issued in this State (Act of May 17, 1921, P. L. 682, Sec. 409) as respects provisions other than those required by the Act to be inserted or those which are expressly prohibited, subject to review by the Court of Common Pleas of Dauphin County; and we are warranted in assuming that the

---

[4] See Northwestern Mutual Life Ins. Co. v. Johnson, supra, p. 102.

clause in the policy in question, whether the insurance is payable to a named beneficiary or to the insured's estate, was put in the policy with the approval of the Secretary of Insurance.

Judgment affirmed.